**WO**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Lester Shoemaker, a married person<br>                                    Plaintiff,<br><br>v.<br><br>Lincoln National Life Insurance Co., a<br>foreign insurer,<br>                                    Defendant. | CV 11-1368-PHX-JAT<br><br>**ORDER** |

Pending before the Court is Defendant Lincoln National Life Insurance Company's Motion for Summary Judgment (the "Motion").  (Doc. 32).  Defendant has also filed a Statement of Facts and exhibits with the Court.  (Doc. 33).  Plaintiff Lester Shoemaker has filed a Response (Doc. 38) and a Statement of Facts and exhibits (Doc. 36).  Finally, Defendant has filed a Reply (Doc. 41).

**I.    BACKGROUND**

In 1982, Plaintiff obtained at least four term life insurance policies (the "1982 Policies") from Defendant (known at that time as American Guardian Life Assurance Company)[1].  (Doc. 36 at 1).  Years later, Plaintiff decided to convert his term life

---

[1]  Defendant Lincoln National Life Insurance Company assumed administration of Plaintiff's life insurance policies in 2007 from Jefferson Pilot, who had assumed administration of Plaintiff's life insurance policies from the original issuing insurance company, American Guardian Life Assurance Company.  (Doc. 33 at 17 ¶ 46).  For the sake of clarity the Court will refer to all three as "Defendant."

insurance policies to a form of permanent life insurance.  (*Id*. at 2).  Plaintiff consulted with insurance agent Roger Holt about converting his 1982 Policies.  (*Id*.)

Plaintiff's 1982 Policies contained riders that potentially waived the annual premiums that Plaintiff owed Defendant (the "Waivers").  (*Id*. at 3); *see also* (Doc. 36-1 at 87).  The Waivers stipulated that in the event Plaintiff became totally disabled then Defendant would waive the payment of premiums for the 1982 Policies.  (Doc. 36 at 3).  In making the conversion, Plaintiff wanted to ensure that the Waivers would also be in his new converted policies.  (*Id*.)  Plaintiff was assured by Mr. Holt that the new policies would contain the same Waivers.  (*Id*.)

In 1986, while living in Pennsylvania and under the direction of Mr. Holt, a Pennsylvania based insurance agent, Plaintiff completed an application for and was issued a Flexible Premium Adjustable Life Insurance Contract by Defendant, Policy number 19782AG (the "1986 Policy").  (Doc. 33 at 1-2).  In 1987, with Mr. Holt's help, Plaintiff completed another application for and was issued another Flexible Premium Adjustable Life Insurance Contract by Defendant, Policy number 197783AG (the "1987 Policy) (the 1986 Policy and 1987 Policy are collectively referred to as the "Policies") (the application for the 1986 Policy and application for the 1987 Policy are collectively referred to as the "Contracts").  (*Id*. at 2).  The Contracts contain no choice of law provisions.  (*Id*. at 2-3 ¶¶ 3, 6).

After signing the Contracts, Plaintiff claims he does not remember receiving copies of the actual Policies.  (Doc. 36 at 4 ¶ 16).  However, Plaintiff admitted in his deposition that he was "sure that" he received copies of the Policies after he purchased them.  (Doc. 33-1 at 58).  The Policies state that Plaintiff had twenty days to review the Policies and that in that time they could be returned for any reason and Defendant would treat the Policies as if they had never been issued.  (*Id*. at 2, 30).  Plaintiff did not return the Policies within the twenty day period.  (Doc. 33 at 3 ¶ 9).

**A.     How the Policies Functioned**

As Defendant explains, Flexible Premium Adjustable Life Insurance policies

function differently than Plaintiff's 1982 Term policies in significant ways. (Doc. 32 at 3). First, the policy holder does not pay a set amount of premiums determined by the insurer, instead, the insured may choose the frequency of the premiums and the amount. (*Id*.) Second, the Policies generate cash value based upon, among other things, the premiums the insured pays and the interest earned by the policy. (*Id*.) The accumulated value of the policy is called the Net Cash Value and the policy will remain in force for as long as the Net Cash Value is sufficient to cover the next month's insurance charges— namely, the monthly expense deductions, monthly cost of insurance, and modal premium for any and all riders the insured has on the policy ("Insurance Charges"). (*Id*.) Therefore, the amount of the premiums chosen by the insured must be sufficient to add enough to the Net Cash Value to cover the Insurance Charges and keep the policy in force.

The Insurance Charges—specifically the cost of insurance—varies by the gender, age, and risk class (e.g. smoker vs. non-smoker) of the insured and, as such, will increase as the insured gets older. (*Id*.) If the Insurance Charges are increasing as the insured gets older and the interest earned by the policyholder is performing poorly; the planned premiums originally selected by the policyholder may become insufficient to cover the Insurance Charges and the Net Cash Value will be used to pay for the Insurance Charges, as a result the Net Cash Value will decline. (*Id*. at 3-4).

With Flexible Premium Life Insurance policies, like the ones at issue here, the policyholder designates a "planned premium" amount which is part of the amount the policyholder plans to pay towards keeping the policy in force. (*Id*. at 4). Plaintiff made this designation by filling out a Supplement to Application for Flexible Premium Life Insurance for each Policy (the "Supplements"). (Doc. 33-1 at 28, 50). The Supplements state what the total annual premiums are that Plaintiff will owe to keep the Policies in force, assuming this amount and the interest earned by the Policies will cover the Insurance Charges. (*Id*.) Plaintiff signed the Supplements and also admitted them into the record as exhibits in this case. (Doc. 36-1 at 99, 101).

The Supplement to the 1986 Policy states that the first year annual premium is the

1   "minimum including disability premium waiver" (written by hand).  (Doc. 33-1 at 28).

2   Above the handwritten words "minimum including disability premium waiver" are

3   handwritten numbers showing the mathematical calculation of the first year annual

4   premium.  (*Id*.)  These numbers read "3873.50 + 174.31 = 4071.81".  (*Id*.)  On the next

5   line it says "Planned annual premium thereafter" is "$ Same" ("Same" written by hand).

6   (*Id*.)  Accordingly, the total annual premium Plaintiff planned on owing for the 1986

7   Policy was $4,071.81.  (Doc. 33 at 5 ¶ 15).  This amount appears to be the sum of: 1) the

8   planned premium that Plaintiff selected (i.e. $3,873.50), which was the "minimum

9   premium" Plaintiff could select (*Id*. at 4 ¶ 12); and 2) the annual premium of including a

10  "disability premium waiver" in Plaintiff's 1986 Policy (i.e. $174.31) should Plaintiff later

11  become disabled.  *See* (Doc. 33-1 at 28).

12      The Supplement to the 1987 Policy is similar.  This Supplement also states first

13  year annual premium is the "minimum including disability premium waiver" (written by

14  hand).  (Doc. 33-1 at 50).  Immediately following the handwritten words "minimum

15  including disability premium waiver" there is an arrow to handwritten numbers showing

16  the mathematical calculation of the first year annual premium.  (*Id*.)  These numbers read

17  "1671.50 + 75.22 = 1746.72."  (*Id*.)  On the next line it says "Planned annual premium

18  thereafter" is "$ Same" ("Same" written by hand).  (*Id*.)  Accordingly, the total annual

19  premium Plaintiff planned on owing for the 1987 Policy was $1,746.72.  (Doc. 33 at 5 ¶

20  16).  This amount appears to be the sum of: 1) the planned premium that Plaintiff selected

21  (i.e. $1,671.50), which was the "minimum" Plaintiff could select (*Id*. at 4 ¶ 12); and 2) the

22  annual premium of including a "disability premium waiver" in Plaintiff's 1987 Policy (i.e.

23  $75.22) should Plaintiff later become disabled.  *See* (Doc. 33-1 at 50).

24      Because the Policies provide for flexible premiums, however, a policyholder does

25  not need to pay the "planned premium" at every premium interval and the Policies will

26  remain in force for as long as the Net Cash Value of each Policy is sufficient to cover the

27  Insurance Charges on the monthly calculation date.  (Doc. 32 at 4).

28      The Policies provide for a 60-day "Grace Period" during which time a

policyholder may keep the Policy in force by paying sufficient additional premiums to keep the Net Cash Value greater than the next monthly Insurance Charges.   (*Id*.) Defendant sends a "grace notice" to the policyholder at least 30 days prior to the end of the grace period.  (*Id*.)  The "grace notice" advised the policyholder: (1) that the policy has entered the "grace period" and (2) the amount needed to keep the policy in force. (*Id*.)

The 1986 and 1987 Policies both contained "Disability Monthly Income Benefit" riders (the "Riders") which functioned similar to the Waivers in Plaintiff's 1982 Policies. *Compare* (Doc. 33-1 at 19, 44), *with* (Doc. 36-1 at 87).  However, unbeknownst to Mr. Holt and therefore unexplained to Plaintiff, the Riders differed from the 1982 Waivers in key ways.  (Doc. 36 at 5 ¶ 28).  While the 1982 Waivers "waive[d] the payment of premiums under [the] policy" in the event the Plaintiff became disabled (Doc. 36-1 at 87), the Riders in the Policies explicitly stated Defendant only "agreed to pay a monthly income" in the event Defendant became disabled and "the payment of the monthly income by [Defendant] will be an amount selected by the Insured."  (Doc. 33-1 at 19, 44).  The "monthly income" that Plaintiff selected pursuant to the Riders was $322.75 (i.e. $3,873.00 annually) for the 1986 Policy (Doc. 33-1 at 94), and $139.33 (i.e. $1,671.96 annually) for the 1987 Policy (Doc. 33-1 at 32) (the Policies refer to these amounts as "monthly disability benefit[s]").  It appears these "monthly income" amounts, or "monthly disability benefit" amounts, would be applied to the total annual premiums that Plaintiff owed Defendant for the Policies, which would then be added to the Net Cash Value of the Policies.

Unlike the 1982 Policies, the 1986 and 1987 Policies did not contain premium disability waivers, i.e. waivers of the total premiums in the event the insured became disabled, contrary to what Plaintiff was seeking in the Policies and what Mr. Holt told Plaintiff he was receiving.  The Riders never use the term "waiver," never discuss waivers, nor do they agree to waive any part of premiums.  The only time the term "premiums" is used in the Riders is when they state, "[t]his Rider is issued in consideration of the application for the policy and this Rider, and the payment of the

premiums for this Rider." (*Id*. at 19, 44).  While not addressed by the parties, this sentence explains the entire cost of the total annual premiums Plaintiff agreed to pay in the Supplements. *See* (*id*. at 28, 50).  As explained in the Supplements, handwriting fills in the blank next to "First year annual premium" and says "minimum including disability premium waiver."  The "minimum" was the amount Plaintiff chose to pay for his planned premiums.  The "disability premium waiver" was not a premium waiver in the event of disability at all, it was the cost of the premium for the Riders.  This amount was $174.31 for the Rider in the 1986 Policy and $75.22 for the Rider in the 1987 Policy.  (*Id*.)  These premiums for the Riders added to the selected planned premiums equaled the total annual premiums that Plaintiff owed Defendant in the first year and annually after the first year for the Policies.[2]

The annual amounts of "monthly income" selected by Plaintiff in the Riders (the "Annual Disability Benefit"), that Defendant would pay in the event Plaintiff became disabled, were very close to the amounts Plaintiff selected for his planned premiums in the Supplements.  In the 1986 Policy, Plaintiff selected a "monthly income" under the 1986 Rider that annually equaled $3,873.00 ($322.75 per month) and Plaintiff selected a planned premium of $3,873.50 in the 1986 Supplement. *Compare* (*id*. at 94), *with* (*id*. at 28).  In the 1987 Policy, Plaintiff selected a "monthly income" under the 1987 Rider that annually equaled $1,671.96 ($139.33 per month) and Plaintiff selected a planned premium of $1,671.50 in the 1987 Supplement. *Compare* (*id*. at 32), *with* (*id*. at 50).  Plaintiff mistakenly believed that because he selected an Annual Disability Benefit under the Riders that almost covered the planned premiums he also selected, that in the event he became disabled his Annual Disability Benefits from the Riders would cover his total annual premiums for the Policies and he would be left owing Defendant nothing for the Policies.  (Doc. 36 at 5 ¶ 23).

---

[2] On the line after "First year annual premium" it says "Planned annual premium thereafter" and following that it says "$ Same" where "Same" is written by hand.  Accordingly, whoever filled out the form clearly intended for the "Planned annual premium" after the first year to also equal the "minimum including disability premium waiver." *See* (Doc. 33-1 at 28, 50).

It appears Plaintiff did not account for the fact that his selected Annual Disability Benefits under the Riders ($3,873.00 and $1,671.96 for the 1986 and 1987 Policies respectively) were only a payment applied to his total annual premiums ($4,071.81 and $1,746.72 for the 1986 and 1987 Policies respectively) and would not cover the two payments that made up the total annual premiums—the planned premiums ($3,873.50 and $1,671.50 for the 1986 and 1987 Policies respectively) *and* the annual premiums for carrying the Riders in the Policies ($174.31 and $75.22 for the 1986 and 1987 Policies respectively).  In addition, Plaintiff claims in 1986 and 1987, he did not realize that the Insurance Charges would increase as he got older and the stable planned premiums he selected may not always add enough to the Net Cash Value to cover the Insurance Charges.  (Doc. 36 at 5 ¶ 26).

### B.   Parties' Actions Under the Policies

After the Policies were issued in 1986 and 1987, Plaintiff moved to Arizona in 1989.  (*Id*. at 4).  Each year Defendant mailed Plaintiff an annual "Statement of Account," giving Plaintiff comprehensive information on the Net Cash Value and Insurance Charges of his Policies.   (Doc. 33 at 9).   In 1991, Plaintiff submitted a disability claim to Defendant qualifying Plaintiff for the Riders in the Policies.  (*Id*. at 9-10).   Defendant approved the disability claim and sent Plaintiff a letter and a repayment for overpaid premiums after Defendant back dated Plaintiff's disability to 1990.  (*Id*. at 10).   This letter, sent in November 1991, said Plaintiff's next payment was not due until January 1993 and informed Plaintiff that Defendant was paying the "monthly income" pursuant to the Riders to Plaintiff's Policies.  (*Id*.)  The payments of "monthly income" under the Riders were applied to the Net Cash Value of Plaintiff's Policies and were enough to keep the Net Cash Value of the Policies from declining due to the Insurance Charges until 2002.  (*Id*. at 10-15).

In February 2002, the Insurance Charges for the Policies exceeded the amount that was being added to the Policies, i.e. the "monthly income" under the Riders and interest earned by the Policies.  (*Id*. at 15).  As a result, the Net Cash Value of the Policies

1   dropped for the first time.  (*Id*.)  This drop in the Net Cash Value was noted on the 2002

2   Statement of Account that Defendant sent to Plaintiff.  (Doc. 33-1 at 66-75).

3       In October 2004, Defendant sent Plaintiff two letters regarding his Policies that

4   Plaintiff received.  (Doc. 33 at 15-16 ¶¶ 43, 44); (Doc. 36 at 9 ¶¶ 43, 44).  These letters

5   informed Plaintiff that "in recent years" Defendant had mistakenly been paying Plaintiff's

6   Policies the wrong amount of "monthly income" that Plaintiff was entitled to under the

7   Riders.  (*Id*.)

8       In the letter regarding the 1986 Policy, Defendant informed Plaintiff that instead

9   of the $3,873.00 that Plaintiff had selected as the Annual Disability Benefit under the

10  1986 Rider, Defendant had been paying the 1986 Policy the "entire policy premium."

11  (Doc. 33 at 15-16 ¶ 43).  The total annual premium for the 1986 Policy, as discussed

12  above, was $4,047.81.   (Doc. 33-1 at 28).[3]   Apparently, Defendant had been paying

13  $4,047.81 annually into the 1986 Policy instead of the $3,873.00 that Defendant agreed to

14  pay annually, and that Plaintiff had selected under the 1986 Rider, a difference of $174.81.

15      In the letter regarding the 1987 Policy, Defendant informed Plaintiff that instead

16  of the $1,671.96 that Plaintiff had selected as the Annual Disability Benefit under the

17  1987 Rider, Defendant had been paying the 1987 Policy the "entire policy premium."

18  (Doc. 33 at 16 ¶ 44).  The total annual premium for the 1987 Policy, as discussed above,

19  was $1,746.72.  (Doc. 33-1 at 50).  Like the 1986 Policy, Defendant had apparently been

20  paying $1,746.72 annually into the 1987 Policy instead of the $1,671.96 that Defendant

21  agreed to pay annually, and that Plaintiff had selected under the 1987 Rider, a difference

22  of $74.78.

23  ─────────────────
[3] Defendant claims it advised Plaintiff that Plaintiff "was inappropriately credited the
24  annual amount each month."  (Doc. 32 at 6) (citing Doc. 33 at 15-16 ¶¶ 43, 44).  This
    claim, however, is unsupported by what the letters actually said to Plaintiff.  The letters
25  said "in recent years your policy has mistakenly been credited with the entire policy
    premium rather than the annual benefit . . . provided by your . . . Rider."  (Doc. 33 at 15-
26  16 ¶¶ 43, 44).  It is unclear how this sentence means the "entire policy premium" was
    paid to the Policies each *month*.  The Court sees no other way to interpret the letter than
27  to mean that the "entire policy premium" was the total annual premium agreed to in the
    Supplements (Doc. 33-1 at 28, 50) ($4,047.81 for the 1986 Policy and $1,746.72 for the
28  1987 Policy).   And these were the amounts paid each year, not each month, to the
    Policies.

After receiving the letters Plaintiff called Defendant to clarify their meaning. (Doc. 36 at 9 ¶ 44). Plaintiff states the letters left him with the impression that he had to pay $174.79 annually for the 1986 Policy and $74.78 annually for the 1987 Policy. (*Id*.) After another phone call with Defendant on November 8, 2004, Plaintiff sent a letter to Defendant on November 19, 2004, regarding the 1986 Policy letter stating he feared the 1986 Policy letter (received October 21, 2004) "could put [his] policies at risk of lapsing." (Doc. 36-1 at 132). Plaintiff stated, "I will proceed based upon my understanding of the two telephone conversations but also enclose a check." (*Id*.) Plaintiff sent a check to Defendant for $179.79 to make up the difference that Plaintiff owed in his premium on the 1986 Policy.[4] (*Id*.)

In 2007, the Net Cash Value of the 1986 Policy decreased again. (Doc. 36 at 10 ¶ 50). Plaintiff states this is when he first understood that the Net Cash Values of his Policies were decreasing because the cost of insurance was increasing as he aged. (*Id*. at ¶ 46); *see also* (Doc. 33-1 at 63). Plaintiff took no action at this time.

From 2007 until 2010, the Net Cash Value of Plaintiff's Policies continued to decline because as Plaintiff aged, his monthly Insurance Charges increased and those charges ultimately exceeded the "monthly income" payments Defendant was paying under the Riders (since 2004, $3,873.00 and $1,671.96 annually for the 1986 and 1987 Policies respectively) and the interest the Policies were earning. (Doc. 32 at 7). The Net Cash Value of the Policies was used to make up the difference between the Insurance Charges and the "monthly income" payments and interest until the balance of the Net Cash Value came close to zero, triggering grace notices to be sent to Plaintiff. (*Id*.)

In March, April, and November of 2010, Defendant sent grace notices to Plaintiff informing him that the Policies would lapse if he did not make additional premium payments. (*Id*.) Pursuant to the grace notices, Plaintiff remitted payments to Defendant to keep the Policies from lapsing. (*Id*.)

---

[4] The record does not indicate whether Plaintiff also paid the $74.78 he admits he understood he owed for his premium on the 1987 Policy.

On June 13, 2011, Plaintiff filed his Complaint in the Superior Court of Maricopa County.  (Doc. 1-1 at 5-10).   In the Complaint, Plaintiff alleged three claims against Defendant.   These claims include: Count One for breach of contract; Count Two for a declaratory judgment; and Count Three for Misrepresentation.  (*Id*. at 8-9).  On July 11, 2011, Defendant removed this action to federal court.  (Doc. 1).  On September 14, 2011, the parties stipulated to the dismissal of Count Three and the Court ordered Count Three dismissed.  (Doc. 20).  On August 9, 2012, Defendant filed the pending Motion seeking summary judgment on Counts One and Two.  (Doc. 32).

## II.    DISCUSSION

In the Motion, Defendant first argues that Pennsylvania law applies to the Court's consideration of the Contracts and to the interpretation of the Contracts' terms.  (Doc. 32 at 7).   Defendant then argues that under Pennsylvania law it is entitled to Summary Judgment on Plaintiff's breach of contract claim because Plaintiff's claim is barred by the Pennsylvania statute of limitations.  (*Id*. at 15).   Finally, Defendant contends that under Pennsylvania law Plaintiff cannot establish his breach of contract and declaratory judgment claims therefore Defendant is entitled to Summary Judgment.  (*Id*. at 12).

Summary judgment is only appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  *Id*. 56(c)(1)(A)&(B).  Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be

unable to establish a genuine issue of material fact. *Id*. at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id*. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). In the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248 (1986). A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *Id*. at 248. A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id*.

At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id*. at 249-250. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment. *Id*.

### A.    Choice of Law

When a conflict of law exists "in a diversity case, the district court must apply the choice-of-law rules of the state in which it sits." *Abogados v. AT & T, Inc*., 223 F.3d 932, 934 (9th Cir. 2000) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487 (1941)); *Jorgensen v. Cassiday*, 320 F.3d 906, 913 (9th Cir. 2003). "Arizona courts apply the Restatement [(Second) of Conflict of Laws ('Restatement')] to determine the applicable law in a contract action." *Gomez-Silva v. Jackson Nat. Life Ins. Co*., CV09-2120 PHX DGC, 2011 WL 1656507, at *1 (D. Ariz. May 3, 2011) (citing *Swanson v. Image Bank,*

1   *Inc.*, 77 P.3d 439, 441 (Ariz. 2003)); *Cardon v. Cotton Lane Holdings, Inc*., 841 P.2d 198,
2   202 (Ariz. 1992).  Both parties argue that the Restatement applies to the Contracts, they
3   disagree, however, over which part of the Restatement governs.  (Doc. 32 at 7); (Doc. 38
4   at 4).

5       Defendant argues that section 192 governs the Contracts and therefore
6   Pennsylvania law applies to them.  (Doc. 32 at 12).  Plaintiff argues that Arizona law
7   applies to the statute of limitations governing the Contracts under section 142 of the
8   Restatement. (Doc. 38 at 4).

9       The Court finds section 142 does not apply to the Contracts.  "[S]ection 142
10  begins with the *general rule* that the limitations period of the forum will apply, unless
11  exceptional circumstances make such a result unreasonable and, in cases in which the
12  claim will not be barred under the forum's statute, either of the conjunctive factors stated
13  in section 142(2) is not satisfied."  *DeLoach v. Alfred*, 960 P.2d 628, 630-31 (Ariz. 1998)
14  (emphasis in original) (citation omitted); *see* Restatement (Second) of Conflict of Laws §
15  142 (1971).  Section 142 is a specific application of a general principal.  *See* Restatement
16  (Second) of Conflict of Laws ch. 6, topic 2.  The introductory notes to chapter 6, of which
17  section 142 is a part, explicitly state "[t]his chapter does not deal with the situations where
18  federal courts apply State law."  *Id*. at ch. 6, intro. note.

19      While section 142 is a general rule, section 192 of the Restatement expressly
20  governs the applicable law of life insurance contracts.  Section 192, "Life Insurance
21  Contracts," states that rights created by "a life insurance contract" are determined,

22          in the absence of an effective choice of law by the insured in
23          his application, by the local law of the state where the insured
            was domiciled at the time the policy was applied for, unless,
24          with respect to the particular issue, some other state has a
            more significant relationship under the principles stated in § 6
25          to the transaction and the parties.

26  *Id*. at § 192.  Because section 192 is more specific to life insurance contracts and to the
27  precise issue in this lawsuit, section 142 does not control.  *See Giezl v. Town of Gilbert*,
28  529 P.2d 255, 258 (Ariz. Ct. App. 1974) (noting that a specific statute controls over a

1   general statute).

2          In applying section 192, the Court must decide three issues: (1) Did Plaintiff

3   choose a particular state's law in his application? (2) If not, where was Plaintiff domiciled

4   when he applied for the policy? (3) Does some other state have a more significant

5   relationship than the domicile state under the principles stated in section 6 of the

6   Restatement?

7          In looking at the Contracts, the Court finds no part of the record alluded to by

8   either party actually gives Plaintiff the option to choose the law applicable to the

9   Contracts.  *See* (Doc. 33-1 at 24, 51); (Doc. 36-1 at 92, 97).  Nonetheless, Plaintiff still did

10  not choose a particular state's law in his applications for the Policies.  Under section 192,

11  the Court is then tasked with looking at where Plaintiff was domiciled when he applied for

12  the Policies.

13         Plaintiff did indicate that he was domiciled in Pennsylvania on his applications for

14  the Policies.  (Doc. 33-1 at 24, 51).  He applied for and was issued the Policies while he

15  was domiciled in Pennsylvania.  (Doc. 33 at 2, 5).  The agent that helped Plaintiff apply

16  for the Policies was also domiciled in Pennsylvania.  (*Id*. at 8).  The insurance company

17  that Plaintiff applied for the Policies from was a Pennsylvania company.  (*See* Doc. 33-1

18  at 24, 51) (The Contracts are both titled "American Guardian Life Assurance Company /

19  Jenkintown, Pennsylvania 19046").   This creates a rebuttable presumption that

20  Pennsylvania law applies to the Contracts, unless some other state has a more significant

21  relationship pursuant to section 6 of the Restatement.

22         Section 6(1) directs the Court to follow any forum state statute that specifies the

23  law to be chosen.  Restatement § 6(1).  Under section 6(2), if there is no directive from the

24  forum state that specifies the law to be chosen, then the Court should look to various

25  factors to determine whether a significant relationship exists.  *Id*. at § 6(2).  Arizona law

26  specifies that Arizona statutes governing insurance contracts, "shall not apply to:"

27  "[p]olicies or contracts not issued for delivery in this state nor delivered in this state."

28  A.R.S. § 20-1101.  Thus, Arizona law is precluded from applying to the Contracts because

1   the Policies were issued and delivered in Pennsylvania.   Consequently, under the

2   principles and language of section 6 the Court need not even consider the factors in

3   section 6(2) because the Court is directed to "follow [the] statutory directive of [Arizona]

4   on choice of law" in section 6(1).   Restatement § 6(1).   Therefore, Pennsylvania law

5   applies to the Contracts.

6   **B.      Plaintiff's Breach of Contract Claim and Pennsylvania's Statute of**
7   **Limitations**

8          Plaintiff has accused Defendant of breach of contract.   (Doc. 1-1 at 8).   Under

9   Pennsylvania law, a breach of contract action based upon a written contract has a four-

10  year statute of limitations.   42 Pa. Cons. Stat. § 5525(8); *see also McGaffic v. City of New*

11  *Castle*, 973 A.2d 1047, 1052 (Pa. Commw. Ct. 2009) ("Most breach of contract actions

12  are governed by a four-year statute of limitations").   "Generally speaking, the statute of

13  limitations begins to run as soon as the right to institute and maintain the suit arises."

14  *McGaffic*, 973 A.2d at 1052 (citing *Sevast v. Kakouras*, 915 A.2d 1147 (Pa. 2007)).   "In

15  an action for breach of contract, the statute begins to run on the date the action accrues—

16  the date of the breach."   *Id*. (citing *Packer Soc. Hill Travel Agency, Inc. v. Presbyterian*

17  *Univ. of Pa. Med. Ctr.*, 635 A.2d 649 (Pa. Super. Ct. 1993)); *Crouse v. Cyclops Indus*.,

18  745 A.2d 606, 611 (Pa. 2000) ("[T]he statute of limitations begins to run as soon as a right

19  to institute and maintain suit arises.") (citing *Pocono Int'l Raceway, Inc. v. Pocono*

20  *Produce, Inc*., 468 A.2d 468, 471 (Pa. 1983)).

21         The central question before the Court then is when Plaintiff knew or should have

22  known the alleged breach occurred.   Plaintiff states he thought he had Policies for life

23  insurance with a secured level premium and a disability waiver of that premium when he

24  signed the Contracts and was issued the Policies in 1986 and 1987.   (Doc. 38 at 3); (Doc.

25  1-1 at 7-8 ¶¶ 16-17).   Plaintiff believed that the waiver would "serve to pay all the

26  premiums if he became disabled."   (Doc. 38 at 3).   This is the bargained for exchange that

27  Plaintiff thought he had received.   Regardless of what the Contracts actually stated, it

28  would logically follow that a breach of this agreement from Plaintiff's perspective would

1    happen if either, 1) Defendant raised the premiums, or 2) if Defendant did not waive the

2    entire premium in the event Plaintiff obtained a disability waiver in the future.  Indeed,

3    Plaintiff's sole allegation for breach of contract is that Defendant breached the contract by

4    failing to provide a waiver of the entire premium.   (*Id*. at 11); (Doc. 1-1 at 8).

5    Accordingly, to determine when the statute of limitations began to run, the Court must

6    decide when Plaintiff knew or should have known Defendant was not waiving the total

7    premiums on the Policies.

8          Plaintiff argues, under Arizona law, the discovery rule applies and that the finder

9    of fact must consider whether a party was reasonably diligent in discovering the breach of

10   contract.  (Doc. 38 at 6-7).  Arizona law, however, does not apply to the Contracts.  Under

11   Pennsylvania law, "[a]s a general rule, it is the duty of the party asserting a cause of action

12   to use all reasonable diligence to properly inform himself of the facts and circumstances

13   upon which the right of recovery is based and to initiate suit within the prescribed period."

14   *Crouse*, 745 A.2d at 611 (citing *Hayward v. Med. Ctr. of Beaver Cnty.*, 608 A.2d 1040,

15   1042 (Pa. 1992)).

16                   However, in some circumstances, although the right to
                     institute suit may arise, a party may not, despite the exercise
17                   of diligence, reasonably discover that he has been injured.  In
                     such cases the statute of limitations does not begin to run at
18                   the instant the right to institute suit attaches, rather the
                     discovery rule applies.   The discovery rule is a judicially
19                   created device which tolls the running of the applicable
                     statute of limitations until the point where the complaining
20                   party knows or reasonably should know that he has been
                     injured and that his injury has been caused by another party's
21                   conduct.  *Pearce v. Salvation Army*, 674 A.2d 1123, 1125
22                   (Pa. Super. Ct. 1996).

23

24   *Id*.  Plaintiff bears the burden of showing that the discovery rule applies.  *PSC Info Group*

25   *v. Lason, Inc*., 681 F. Supp. 2d 577, 591 (E.D. Pa. 2010) ("When a party seeks an

26   exception to the general rule that 'the statute of limitations begins to run as soon as the

27   right to institute and maintain a suit arises,' that party bears the burden of showing that an

28   exception to that general rule applies.") (citing *Pocono Int'l Raceway*, 468 A.2d at 471).

"Pursuant to application of the discovery rule, the point at which the complaining party should reasonably be aware that he has suffered an injury is a factual issue best determined by the collective judgment, wisdom and experience of jurors." *Crouse*, 745 A.2d at 611 (internal citations and quotations omitted).  While the determination of when Plaintiff knew or should have known of the alleged breach is best determined by the finder of fact, the Court is not precluded from making this determination as a matter of law.  The Pennsylvania Supreme Court has held that "[w]hen dealing with the discovery rule, 'only where the facts are so clear that reasonable minds cannot differ may the commencement of the limitations period be determined as a matter of law.'" *PSC Info Group*, 681 F. Supp. 2d at 591-92 (citing *Crouse*, 745 A.2d at 611).

Therefore, under Pennsylvania law, the Court must determine if the facts are so clear in this case that reasonable minds could not differ as to when Plaintiff knew or reasonably should have known that Defendant was not waiving the entire premium.  The issue is not when Plaintiff understood the Riders or when Plaintiff understood that the Net Cash Value of his Policies was decreasing.  Plaintiff thought he had an agreement by which Defendant would waive his total premiums in the event Plaintiff became disabled.  Plaintiff became disabled.  The agreement Plaintiff thought he had would have been breached at the moment Plaintiff was told by Defendant that the total premiums were not waived.

Turning to the facts in this case, in October 2004, Defendant sent two letters to Plaintiff regarding the 1986 and 1987 Policies respectively.[5]  (Doc. 33-2 at 24, 27).  The

---

[5] The letter regarding the 1986 Policy reads,

> At the time you purchased your policy a Monthly Disability Benefit of $322.75 was chosen.  This Monthly Disability Benefit is applied to your policy while you remain totally disabled.  However, in recent years your policy has mistakenly been credited with the entire policy premium rather than the annual benefit of $3873.00 provided by your Total and Permanent Disability Rider.  This has resulted in an overpayment by Jefferson Pilot to the cash value of your policy.  Since this was our error we are not asking for a

letters informed Plaintiff that he was entitled to the Monthly Disability Benefit that he had chosen because he had become disabled.[6] (*Id*.)  In the next sentence, Defendant explains to Plaintiff that in recent years Defendant had mistakenly credited Plaintiff's Policies with "the entire policy premium *rather than* the annual benefit . . . provided by your . . . Rider[s]."  (*Id*.) (emphasis added).  Plaintiff believed when he signed the Contracts that the Riders on the Policies would pay for the entire policy premiums if he became disabled.  (Doc. 36 at 5 ¶ 23).  The letters explicitly state that "in recent years," that is exactly what

> refund of the amount overpaid.  But from this time forward we will only credit the appropriate Monthly Disability Benefit.  You will receive an annual premium billing and will be responsible for payment of the difference between the Monthly Disability Benefit and the premium due.  For your records we are providing the following information:
>
> Disability Monthly Income Benefit: $322.75
> Annual Amount Credited to Policy: $3,873.00

(Doc. 33-2 at 24).  The letter regarding the 1987 Policy is almost identical and reads,

> At the time you purchased your policy a Monthly Disability Benefit of $139.33 was chosen.  This Monthly Disability Benefit is applied to your policy while you remain totally disabled.   However, in recent years your policy has mistakenly been credited with the entire policy premium rather than the annual benefit of $1671.96 provided by your Total and Permanent Disability Rider.  This has resulted in an overpayment by Jefferson Pilot to the cash value of your policy.   Since this was our error we are not asking for a refund of the amount overpaid.  But from this time forward we will only credit the appropriate Monthly Disability Benefit.  You will receive an annual premium billing and will be responsible for payment of the difference between the Monthly Disability Benefit and the premium due.  For your records we are providing the following information:
>
> Disability Monthly Income Benefit: $139.33
> Annual Amount Credited to Policy: $1671.96

(*Id*. at 27).

[6] As discussed in Section I.A. *supra*, Plaintiff chose a Monthly Disability Benefit of $322.75 ($3,873.00 annually) for the Rider to the 1986 Policy (Doc. 33-1 at 94) and a Monthly Disability Benefit of $139.33 ($1,671.96 annually) for the Rider to the 1987 Policy (*Id*. at 32).

1    Defendant had been doing—Defendant had been paying the entire policy premium as the

2    payment Defendant owed for the Riders—and Defendant made clear that was a *mistake*.

3    The letter goes on to inform Plaintiff three sentences later, that "from this point forward

4    we will only credit the appropriate Monthly Disability Benefit.  You will receive an

5    annual premium billing and will be responsible for payment of the difference between the

6    Monthly Disability Benefit and the premium due."  (Doc. 33 at 15-16 ¶¶ 43, 44).

7         Plaintiff's sole allegation for breach of contract is that Defendant breached the

8    contract by failing to provide a waiver of the entire premium due to his disability.  (Doc.

9    1-1 at 8).  The letters clearly inform Plaintiff that paying his "entire policy premium" due

10   to his disability was a mistake and that Defendant would no longer be paying the "entire

11   policy premium."  The letters unambiguously explain that payments he is entitled to for

12   his disability will not cover the premiums due on the Policies and he will "be responsible

13   for payment of the difference."

14        Plaintiff admits the letters left him with the impression that he had to pay $174.79

15   annually for the 1986 Policy and $74.78 annually for the 1987 Policy.  (Doc. 36 at 9 ¶ 44).

16   Plaintiff cannot make this admission and reasonably claim he still thought the Riders

17   waived the entire premiums at this point—Plaintiff has just admitted he understood he had

18   to pay on top of the money paid by the Riders to cover his annual costs for the Policies.

19        After receiving the letters Plaintiff called Defendant twice to clarify their meaning.

20   (*Id*.)  Plaintiff sent a letter to Defendant on November 19, 2004, regarding the 1986 Policy

21   letter stating he feared the 1986 Policy letter (received October 21, 2004) "could put [his]

22   policies at risk of lapsing."  (Doc. 36-1 at 132).  Under Plaintiff's admitted understanding

23   of the Contracts he signed in 1986 and 1987, if the premiums were being waived due to

24   his disability, there would be no risk of his Policies lapsing.  Plaintiff thought he had a

25   disability waiver that covered the premium and protected against changes in the premium

26   due to age.  (Doc. 36 at 5 ¶¶ 23-24, 29).  Further, Plaintiff thought he had a level premium

27   that covered the cost of insurance.  (*Id*. at 2 ¶ 4).  If Plaintiff still held these beliefs after

28   the October 2004 letters, he would have no fear of his Policies lapsing.  But that is not

1    what happened.

2          Plaintiff told Defendant in his letter, "I will proceed based upon my understanding

3    of the two telephone conversations but also enclose a check."  (Doc. 36-1 at 132).

4    Plaintiff sent a check to Defendant for $179.79 to make up the difference that Plaintiff

5    owed in his premium on the 1986 Policy.  (*Id*.)  It is clear from Plaintiff's letter that at this

6    time he was confused as to how the Riders operated.  However, being confused about how

7    the Riders operated and being ignorant that the Riders were not waiving the entire policy

8    premium are two different things.

9          Even if Plaintiff was confused as to the operation of the Riders in 2004, Plaintiff

10   admits he understood the Policies were decreasing in value in 2007 and claims this was

11   the first time he understood that Defendant's interpretation of the Policies was different

12   than his own.  (Doc. 36 at 10 ¶ 46).  Yet Plaintiff did not file a claim until June 13, 2011,

13   almost four years later.  (Doc. 1-1 at 5).

14         The Court finds that the letters sent by Defendant and the letter and payment sent

15   by Plaintiff make the facts so clear that reasonable minds could not differ as to the fact

16   that Plaintiff knew or reasonably should have known that Defendant was not waiving the

17   entire premium and Plaintiff would have to pay part of the premiums no later than 2004.

18   Therefore, Plaintiff had a right to allege and maintain a breach of contract claim in late

19   2004 because at that point Defendant was not abiding by the agreement Plaintiff thought

20   he had made.  Accordingly, the statute of limitations began to run in December 2004 and

21   ended four years later.  Plaintiff did not bring this claim until June 2011, well over six and

22   a half years later.   The Court grants Defendants motion for summary judgment on

23   Plaintiff's breach of contract claim because that claim is barred by the Pennsylvania

24   statute of limitations.

25         Further, because Plaintiff's declaratory judgment claim is dependent on the breach

26   of contract claim the Court grants Defendant's motion for summary judgment on both

27   claims.

28   //

1    **III.    CONCLUSION**

2        Based on the foregoing,

3        **IT IS ORDERED** that Defendant Lincoln National Life Insurance Company's

4    Motion for Summary Judgment (Doc. 32) is granted.

5        **IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment in

6    favor of Defendant and against Plaintiff, with Plaintiff to take nothing.

7        **IT IS FINALLY ORDERED** that the Clerk of the Court shall close this case.

8        Dated this 21st day of February, 2013.

9

10

11

12

13                            James A. Teilborg
                              United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28